**PRODUCERS PRODUCE COMPANY,**
Respondent,

v.

**INDUSTRIAL COMMISSION OF MISSOURI, DIVISION OF EMPLOYMENT SECURITY, et al., Appellants.**

Nos. 7292-7300.

Springfield Court of Appeals.

Missouri.

July 19, 1955.

George Schwartz, Lloyd G. Poole, Howard L. McFadden, Jefferson City, for appellants.

Glenn A. Burkart, Frank C. Mann, Mann, Mann, Walter & Powell, Springfield, for respondent.

McDOWELL, Presiding Judge.

The appeals herein are prosecuted by the Industrial Commission of Missouri, Division of Employment Security, from judgment of the Circuit Court of Greene County, Missouri, reversing final decision of the Commission in favor of Claimants for unemployment benefits against Producers Produce Company in consolidated cases Nos. 26085, 26518, 27699, 27683, 27659, 27673, 27663, 27657, and 27701.

We have here nine separate appeals involving issues of unemployment benefits claimed by employees of respondent under the Unemployment Compensation Law. The issues involved in each appeal are the same and have the same factual basis and by agreement are consolidated for opinion.

The essential facts common to all of the appeals are as follows: Respondent, employer, operates under the agricultural cooperative marketing act and is engaged primarily in the processing of poultry and eggs with minor operations in hides and wool. It secures its produce from various produce collecting stations over the outlying country side and processes same in Springfield.

Claimants are production employees of respondent. Prior to June 3, 1950, a labor dispute arose between respondent and its employees as to wage scales and other terms of employment; all of the employees were represented by Local No. 172 of the Amalgamated Meat Cutter and Butcher Workers of North America, an A. F. of L. affiliate. A strike was called June 3rd, and all of the employees, including claimants, joined in the strike and established picket lines at the plant. A complete stoppage of work resulted for the first three days; June 6th, respondent gave notice in the newspapers of Springfield that it would employ replacement help and, thereafter, did begin hiring replacement labor, including fifteen of the strikers, who abandoned the strike. June 7th, the egg drying department was reopened and, thereafter, respondent gradually resumed its other activities, ultimately receiving poultry and reopening its poultry processing department. The testimony shows that the company did not turn any of its business away after about the middle of July.

No actual production figures were offered in evidence but employer's exhibit 5 offered in evidence contained data of the number of employees added to and separated from respondent's payroll in weekly periods subsequent to the strike. This exhibit shows that on the week ending June 8th, 150 workers were hired and that respondent continued to hire workers in substantial numbers through the week ending July 6th, but the week ending July 13th, one worker was hired and 37 laid off and the following week 60 workers were laid off. The picket line was maintained continuously by the union until January 19th, 1951, when, by agreement, the strike was terminated. Throughout the labor dispute the striking workers, including claimants, devoted varying periods of their time to picket duty, being assigned to regular schedules involving their presence at the lot or plant from two to six hours daily. These persons were actually on the picket line a small portion of the time but remained at or near the plant between turns on the picket line. There was no rule of the union requiring picket duty and claimants were free to seek work at times when they were not actually doing picket duty.

The International Union distributed $10.-00 a week strike benefits to the strikers at the lot to members who applied for same. Picket duty was not required for such payment.

The Appeals Referee considered, in addition to the evidence relating to the issues common to all of the claims, the testimony of each claimant bearing on his efforts to find work, denied benefits to claimants with respect to claims filed for weeks prior to July 9, 1950, as well as any subsequent week in which he found them not to have been available for work. He allowed benefits with respect to claims filed for weeks subsequent to July 8, 1950, in which he found the claimants to have been available for work.

The Appeals Referee, in his findings on issues of fact common to all claimants, found in substance, as follows:

(a) that any unemployment of the claimants in the period from June 3, 1950, through July 8, 1950, was due to a stoppage of work which was in existence because of a labor dispute at the respondent's establishment; that subsequent to July 8, 1950, the unemployment of the claimants was no longer due to a stoppage of work in existence because of a labor dispute at the respondent's plant.

(b) that claimants, in withholding their services from respondent during the strike, did not intend to sever the employment relationship, and, therefore, did not leave their work voluntarily within the meaning of the Unemployment Compensation Law.

(c) that the $10.00 weekly strike benefit was a gratuity and not "wages" which would have to be taken into consideration in determining the amount of benefits to which the claimants might otherwise be entitled; that the claimants were unemployed.

(d) that the picketing done by the claimants was not of such nature or extent as to render them unavailable for work within the meaning of the Act.

Respondent's appeals to the Industrial Commission of Missouri from the Referee's decisions were denied by the Commission, thereby making said Referee's decisions those of the Commission for the purpose of judicial review.

Appeals from the decision of the Industrial Commission in each of the cases herein involved were instituted February 6, 1952, in the Circuit Court of Greene County, Missouri, praying for an order of the court reversing the decisions of the Commission as to each of the defendant-claimants.

The petition for review, in part, stated that the Commission erred in finding that claimants' unemployment after July 8th was not due to a stoppage of work existing at employer's establishment due to a labor dispute, and, further, that any failure to produce at a normal rate after that time may well have been due to factors other than the labor dispute.

That the Referee erred in finding that claimants, in withholding services from the employer, did not intend to abandon work and that employer actually terminated claimants' employment and that claimants did not leave work voluntarily.

That the Commission erred in not finding that under the law and evidence the stoppage of work of the claiming employees, resulting from a labor dispute in which the employees were and are now participating, made them ineligible for unemployment compensation benefits.

That the Referee erred in finding that claimants did not leave their employment voluntarily without good cause attributable to their employment.

That the Referee erred in holding that the payment of $10.00 weekly, made by the Union, is a gratuity derived from union membership and not a payment for services, requiring deductions from benefit payments.

The causes were consolidated and tried by the Circuit Court resulting in the following judgment: "It is therefore considered, ordered and adjudged that the said Findings and Award made herein by the Industrial Commission of Missouri, Division of Employment Security, be and the same is reversed as to each and every one of the Defendant-Claimants herein; * * *"

In his Memorandum Opinion the trial court held that under the Missouri Employment Compensation Law, "stoppage of work" as used and defined therein refers to the employees and not to the employer, following the law as declared in Board of Review v. Mid-Continent Petroleum Corp., 193 Okl. 36, 141 P.2d 69, 71. In his opinion the court stated:

"It is the opinion of this Court that from any logical viewpoint of statutory interpretation, taking into account the stated legislative purpose of the Act, the legislature never intended "Unemployment benefits to be paid to strikers. * * * This Court does not believe that when the legislature

enacted the provision denying benefits in any case in which the work stoppage was due to a labor dispute, that there was any thought in the mind of the legislature that an obscure definition in an entirely different section of the Act would be interpreted to mean that unemployment benefits would be payable during a labor dispute if the employer was employing non-union labor. * * *"

Appellants' first allegation of error complains that the lower court erred in construing the unemployment security law as barring striking workers from entitlement to unemployment benefits even though there is no stoppage of work at the employer's establishment.

■ The facts, as herein stated, are substantially those contained in the findings of the Appeals Referee and affirmed by the Commission. The question as to whether claimants were replaced by other employees and full production resumed at respondent's plant were facts resolved by the Appeals Referee, and, from an examination of the record, we find are supported by substantial evidence, and, though attacked here by respondent, we are bound by the findings of the Commission where there is substantial evidence to support its findings.

The issue here presented is one of law as to whether claimants, who in the first instance are ineligible to receive benefits where their original unemployment was due to a stoppage of work because of a labor dispute at the plant of respondent, are later entitled to receive benefits when the employer's plant is operating at full production, claimants have been permanently replaced, a full force of workers are employed at employer's plant, and where claimants are still actively engaged in picketing respondent's plant because of the labor dispute.

The answer to this question lies in the interpretation of the statutes contained in the Missouri Unemployment Compensation Law, Chapter 288, RSMo 1949.[1]

Section 288.120 reads: "Benefits to be denied unemployed workers, when.—1. An individual shall not be eligible to serve a waiting period or to be paid benefits, under the following conditions and until after he has earned wages in employment equal to ten times his weekly benefit amount, if the division finds

"(1) That he has left his work voluntarily without good cause attributable to his employment; or * * *

"(3) * * * (b) Notwithstanding any other provisions of this law, no work shall be deemed suitable and benefits shall not be denied under this law to any otherwise eligible individual for refusing to accept new work under any of the following conditions:

"a. If the position offered is vacant due directly to a strike, lockout, or other labor dispute; * * *

"2. An individual shall be disqualified for benefits under the following conditions and in each case the weeks of such disqualifications shall not be counted as any part of the waiting period:

"(1) For any week with respect to which the division finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute in the factory, establishment or other premises in which he is or was last employed; provided, that in the event he secures other employment from which he is separated during the existence of the labor dispute, he must have obtained bona fide employment as a permanent employee for at least the major part of each of two weeks in such subsequent employment to terminate this disqualification; * * * and provided further, that this subsection shall not apply if it is shown to the satisfaction of the division that

"(a) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

"(b) He does not belong to a grade or class of workers of which, immediately pre-

1. Now V.A.M.S. § 288.010 et seq.

ceding the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute".

Section 288.020, subd. 13 of the Act reads:

"'Stoppage of work' as used in section 288.120 means a substantial diminution of the activities, production or service at the establishment, plant, factory or premises of the employing unit."

Section 288.030 of the Act reads: "Declaration of public policy of state.—As a guide to the interpretation and application of this law, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals and welfare of the people of this state resulting in a public calamity. The legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this state require the enactment of this measure, under the police powers of the state, for compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own. This law shall be liberally construed to accomplish its purpose * * *."

■ Respondent contends, and the trial court found that "'stoppage of work'" as used in Section 288.120, subd. 2(1) RSMo 1949, means the work or employment of the individual employee and that by going on strike claimants disqualified themselves for benefits. Appellants contend, and the Commission found, that such phrase means the stoppage of the operation of work at the employer-establishment. In construing the statute this court should ascertain and give effect to the intention of the legislature.

■ Our Supreme Court in Haynes v. Unemployment Compensation Commission, 353 Mo. 540, 183 S.W.2d 77, 81, stated the rule governing the construction of statutes as follows:

" 'The primary rule of construction of statutes is to ascertain the lawmakers' intent, from the words used if possible; and to put upon the language of the Legislature, honestly and faithfully, its plain and rational meaning and to promote its object, and "the manifest purpose of the statute, considered historically," is properly given consideration.' Cummins v. Kansas City Public Service Co., 334 Mo. 672, 684, 66 S.W.2d 920, 925; Artophone Corporation v. Coale, 345 Mo. 344, 133 S.W.2d 343, 347. 'Words and phrases (of a statute) shall be taken in their plain or ordinary and usual sense' (Sec. 655, R.S.1939 [V.A.M.S. §§ 1.020 et seq., 80.010]), and, accordingly, we must so consider the words 'available for work,' which are used in the Unemployment Compensation Act. A. J. Meyer & Co. v. Unemployment Compensation Commission, supra [348 Mo. 147], 152 S.W.2d 184, 189."

The issue presented has not been passed upon in this state. However, other states, with similar Unemployment Compensation Laws, have passed directly upon the question. An examination of the authorities from these states discloses different conclusions reached. The trial court followed the law as declared in Board of Review v. Mid-Continent Petroleum Corp., 193 Okl. 36, 141 P.2d 69. The question involved was the same as that in the instant case. On page 71 of 141 P.2d of the opinion, the court stated:

"Considering first the question whether 'stoppage of work' as used in the Act refers to the individual work of the employee or to the operation of the plant, we agree fully with the position of the corporation and the Attorney General that the provision refers to the individual work of the employee.

"Counsel for Cox state that administrative officers and textwriters say that 'stop page of work' as used in similar statutes of other states and in Great Britain means a shut-down at the factory where the workman was employed. Thus they arrive at the conclusion that unless the plant actually stops operation by reason of the labor dispute, the striker who remains out may receive compensation for unemployment.

Their conclusion is not supported by the decision of any court of last resort to which our attention has been called."

The court in this opinion stated that the term " 'stoppage of work' " was considered as synonymous with "strike" and said: "Were we to adopt the view of Cox's counsel we should hold that the Legislature intended that the unemployment fund be used to support strikes" and said the Act declared " 'For the compulsory setting aside of unemployment compensation funds to be used for the benefit of persons unemployed through no fault of their own' ", and held that " 'fault' must be construed as meaning failure or volition".

Following this decision, the trial court in the instant case, held that following any logical viewpoint of statutory interpretation, taking into account the stated legislative purposes of the Act, the legislature never intended unemployment benefits to be paid to strikers.

The opinion in the Oklahoma case, supra, was by a divided court; the dissenting opinions held that where the language used by the legislature is plain, unambiguous and subject to but one construction, no interpretation to determine its intention is necessary. However, where the situation is otherwise, it is the sole function of the court to determine the intention of the legislature from the language used and all other existing circumstances and so construe the language used as to effectuate its intention if possible and held that by the plain meaning of the provisions of the statute in the use of the words " 'stoppage of work' " at the factory, establishment or other premises at which he is or was last employed because of a labor dispute meant stoppage of work at the factory.

The Commission, in the instant cases, interpreted the meaning of " 'stoppage of work' " to mean stoppage of work at the plant and found that after July 8, 1950, there was no substantial diminution of activities in the employer's plant due to a labor dispute and that claimants' unemployment after July 8th was not due to a stoppage of work existing at the employer's establishment due to a labor dispute. It found from the evidence that claimants did not withhold services on June 3, 1950, and thereafter, with any intention of abandoning the work, rather by their persistent interest in the labor dispute and participation in the picket line kept employer indirectly advised of their continued interest in working after satisfactory negotiations were concluded; that claimants in withholding services did not intend to abandon work and that employer actually terminated claimants' work by obtaining replacements and continuing production without their services. The Referee, accordingly, found that claimants did not leave their work voluntarily without good cause attributable to their employment. This view is supported by the majority rule as declared by the courts of last resort passing upon the issue under similar statutes.

In Robert S. Abbott Pub. Co. v. Annunzio, 414 Ill. 559, 112 N.E.2d 101, 104, 105, 106, the court stated:

"The issue presented here is whether a claimant who in the first instance is ineligible to receive benefits where his original unemployment was due to a stoppage of work because of a labor dispute at the plant of his employer, is later entitled to receive benefits when that employer's plant is operating at full production, claimant has been permanently replaced, and a full force of workers is employed at the employer's plant. * * *

"The question at issue which now confronts us has never been passed upon in this court. The majority rule appears to have been followed by courts of review in Georgia, Maryland, Michigan, Indiana, Arizona, Nebraska, and North Carolina, and by administrative decisions in Connecticut, Indiana, Maryland, Montana, Missouri, Nebraska, New Hampshire, New Jersey, North Dakota, Oklahoma, Oregon, and Utah, and also by an administrative decision of the U. S. Veterans Administrator. The minority rule appears to be embodied in the decision of the Oklahoma Supreme Court in the case of Board of Review v. Mid-Continent Petro-

leum Corp., 193 Okl. 36, 141 P.2d 69. The minority rule was followed in one administrative decision in Colorado. Briefly stated, the majority rule holds that where the employer has permanently replaced all the employees whose employment was terminated in the course of a labor dispute, has fully resumed its normal plan of operations and resumed previous production, then the unemployment of its former employees is no longer due to a stoppage of work because of a labor dispute at the employer's plant. The result of this ruling, if followed by this court, is to hold that unemployed claimants are no longer ineligible for benefits under the Illinois Unemployment Compensation Act upon cessation of the work stoppage."

Chapter 48, Sec. 434, p. 1925, Ill.Rev.Stat. 1953, Vol. I, reads:

"Labor dispute. An individual shall be ineligible for benefits for any week with respect to which it is found that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed, * * *."

Comparing the Illinois statute with the Missouri statute, 288.120, subd. 2(1) we find the two statutes are exactly the same. The Illinois court interprets "stoppage of work" as used in the statutes to refer to a stoppage of work at the plant and not to the individual worker or workers. In so holding, the Ill. Supreme Court in the Robert S. Abbott Pub. Co. v. Annunzio, supra, 112 N.E.2d on page 106 of the opinion stated:

"* * * The provisions of section 7(d) are a substantial reenactment of the English National Insurance Act of 1911, and the language of this section has received a settled construction by the English authorities charged with the administration of the English act prior to the adoption of it by Illinois. Under the British interpretation of the word 'stoppage,' the individual is disqualified for benefits if his unemployment is due to a trade dispute so long as the job which he held continues to be vacant. * * * Va-

cancies might be terminated by the return of the workers, by the hiring of a replacement, or by a readjustment of work operations. * * *"

In Magner v. Kinney, 141 Neb. 122, 2 N.W.2d 689, 693, the court followed the general rule as declared in the Illinois case herein cited. It made the following statements on page 693, of 2 N.W.2d:

"Having determined that claimants' unemployment arises out of a labor dispute, the principal and disposing test of the claim for benefits is whether the unemployment is due to a 'stoppage of work' at the place of employment where last employed.

"The phrase as used in the disqualification clause, subsection (d), refers to the effect upon the employer's operations produced by the labor dispute or, in other words, to resulting unemployment. Subject to its exceptions, it declares disqualification of a class or group whose unemployment is the result of the curtailment or stoppage of the employer's operations. It does not refer to the cessation of work by the individual employee or employees. The disqualification is not personal, but rather for a period of time —the duration of the stoppage. * * *

"* * * Obviously, if those leaving work are immediately replaced, or if the dispute does not otherwise interfere with production or operation and these are not diminished, there is no stoppage of work and hence no disqualification."

In Sakrison v. Pierce, 66 Ariz. 162, 185 P.2d 528, 173 A.L.R. 480, passing upon a similar statute to the Missouri statute, the law is declared on page 531 of 185 P.2d as follows:

"* * * But insofar as we have been able to find, the phrase 'stoppage of work' has been interpreted by courts of last resort in only seven cases. In six of these, it has been held to mean stoppage of work of employer's establishment, not cessation of employees' labors." (See cases cited.)

On page 531 of 185 P.2d the court stated: "The opposite view was taken only by the

Oklahoma Court, Board of Review v. Mid-Continent Petroleum Corporation, 193 Okl. 36, 141 P.2d 69, 71, * * *. This decision not only stands alone on this point so far as we are able to determine, but was written by a divided court, unaware of the two previous decisions of courts of last resort on this matter. * * *

"Apparently, therefore, the Oklahoma Court was relying on findings of inferior tribunals and two cases not in point. These two were, first, Bodinson Mfg. Co. v. California Employment Commission, 17 Cal.2d 321, 109 P.2d 935; Id., Cal.App., 101 P.2d 165, with a statute so unlike our own that it merits no further comment here. And second, Miners in General Group v. Hix, 123 W.Va. 637, 17 S.E.2d 810, 817, which is concerned with the definition of 'labor dispute', and not 'stoppage of work,' but which incidentally adopts a view of 'stoppage of work' contrary to that of the Oklahoma Court in any case. * * *"

It will be noted in the Arizona case that the court discusses cases cited from Kentucky, Tennessee, Ohio and West Virginia, quoting from the statutes of these states showing that they were entirely different from the statute involved in Arizona, which is exactly the same as the statutes involved in the instant case.

The Supreme Court of Michigan in Lawrence Baking Co. v. Michigan Unemployment Compensation Commission, 308 Mich. 198, 13 N.W.2d 260, 262, 264, 154 A.L.R. 660 stated the law:

"'* * * In other words, the technical meaning of the term, "stoppage of work," as used in our disqualification clause, is a substantial curtailment of work in an establishment, not the cessation of work by the claimant or claimants. * * *

"'The majority opinion of the Oklahoma court is based upon its interpretation of the phrase "stoppage of work" as being synonymous with the word "strike." We cannot agree with such interpretation which is contrary to the clear meaning and import of the words used. * * *'" (See cases cited.)

In Mark Hopkins, Inc., v. California Employment Commission, 24 Cal.2d 744, 151 P.2d 229, 231, 154 A.L.R. 1081, this law is stated:

"The strike itself simply suspends the employer-employee relationship but does not terminate it. * * *"

In Re Steelman, 219 N.C. 306, 13 S.E.2d 544, held that under the provisions of the unemployment compensation law relating to withholding benefits during stoppage of work, caused by a labor dispute, the disqualification of claimant were effective only during such stoppage and would be eliminated thereafter in determining eligibility of claimants who did not return to their work.

In discussing the labor dispute provision, the University of Chicago Law Review, Vol. 17, page 308 stated:

"Like most aspects of the Draft Bill, the stoppage of work requirement had its origin in the British Unemployment Insurance Acts. When this country's fifty-one statutes were adopted, the phrase had long since acquired a settled construction from the British Umpires as referring 'not to the cessation of the workmen's labour, but to a stoppage of the work carried on in the factory, workshop or other premises at which the workman is employed.'

"It is scarcely surprising that the overwhelming majority of appellate decisions in the United States have adopted the same interpretation."

Under section 288.120 RSMo 1949 it is expressly provided that an unemployed worker will be denied benefits if the division finds "that he has left his work voluntarily without good cause attributable to his employment;" or if "the division finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute in the factory, establishment or other premises in which he is or was last employed".

" 'Stoppage of work' " is defined by the Act in section 288.020, subd. 13 as follows: " 'Stoppage of work' as used in section 288.120 means a substantial diminution of the activities, production or service at the establishment, plant, factory or premises of the employing unit."

The Act, itself, provides that it shall be liberally construed. In Peerless Fixture Co. v. Keitel, 355 Mo. 144, 195 S.W.2d 449, 452, the Supreme Court stated:

"In applying the auxiliary rules of construction we consider the statute as a whole (1942 Wis.L.R., loc. cit. 20, 198) and, despite the lack of unanimity as to its purposes (55 Y.L.J. pp. 1-52), apply the rules with the view of carrying out the public policy expressed in the act. 42 Am.Jur., Sec. 174, p. 536; Haynes v. Unemployment Compensation Comm., 353 Mo. 540, 544, 183 S.W.2d 77, 81. * * *"

Considering the Act as a whole and giving to the words employed their plain and rational meaning to promote the legislative object, we find that "stoppage of work" means stoppage of work at employer's establishment and not cessation of employees' labor. Sakrison v. Pierce, supra.

In his memorandum of opinion, the trial court stated:

" * * * This Court does not believe that when the legislature enacted the provision denying benefits in any case in which the work stoppage was due to a labor dispute, that there was any thought in the mind of the legislature that an obscure definition in an entirely different section of the Act would be interpreted to mean that unemployment benefits would be payable during a labor dispute if the employer was employing non-union labor. * * *"

We think the trial court disregarded the rule of construction that the statute as a whole should be considered in determining the intention of the legislature in its passage. The lawmaking body's own construction of its language by means of definition of the terms employed, should be followed in the interpretation of the Act or section to which it relates and is intended to apply. Indeed a statutory definition supercedes the commonly accepted, dictionary or judicial definition. Where an Act passed by the legislature embodies a definition, it is binding on the courts. 50 Am.Jur., Sec. 262, p. 254; Lenox Realty Co. v. Hackett, 122 Conn. 143, 187 A. 895, 107 A.L.R. p. 1306.

The trial court followed the opinion in the Oklahoma case, which based its interpretation on the phrase "stoppage of work" as being synonymous with the word "strike". This interpretation is contrary to the clear meaning and import of the words used. The statute said that the individual shall be disqualified if the division finds his unemployment is due to a stoppage of work which exists because of a labor dispute in the factory, establishment or other premises in which he is or was last employed, and then the legislature defined "stoppage of work" to mean a substantial diminution of the activities, production or service at the establishment, plant, factory or premises of the employing unit.

It is admitted here that there was a labor dispute. There was substantial evidence to support the Commission's findings that after the week ending July 8th, there was no longer a substantial diminution of the activities, production or service at the plant of the employing unit. So, it is clear from the plain wording of the statutes that there was no stoppage of work due to the labor dispute after the factory substantially resumed its operations. Yet the strike was not settled. Clearly the meaning of the phrase "stoppage of work" as used in the statutes was not intended by the legislature to be synonymous with the word "strike".

It is contended by respondent that the legislature provided a guide for the interpretation of the Act and declared that the public policy of the state required its enactment for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through

no fault of their own, citing Section 288.-030 RSMo 1949. We have set out this section in our opinion. Respondent cites Haynes v. Unemployment Compensation Comm., 353 Mo. 540, 183 S.W.2d 77. The issue involved in this case was whether respondent was available for work under the Act. The phrase "available for work" is not defined in the statutes. It was pointed out in Wiley v. Carroll, Mo.Sup., 201 S.W.2d 320, 321, that it is not necessary to attempt an inflexible definition. The courts in all jurisdictions agree that no inflexible rule as to what constitutes "availability for work" can be formulated. Availability differs upon facts in each individual case. Leonard v. Unemployment Compensation Board of Review, 148 Ohio St. 419, 75 N.E. 2d 567; Jacobs v. Office of Unemployment Compensation and Placement, 27 Wash.2d 641, 179 P.2d 707. In the Haynes case cited the Supreme Court said [353 Mo.Sup. 540, 183 S.W.2d 82] that to be held available the claimant must show that he is "'capable of being used to accomplish a purpose'" for work; that he was "'at disposal; accessable or obtainable'" for work and that he was "'ready, handy, convenient, usable and obtainable'" for work. The court was passing upon the statutory requirements as they existed in 1943 and contained the proviso that no person shall be deemed available for work unless he has been and is actively seeking work. After the amendment, the Supreme Court in Wagner v. Unemployment Compensation Comm., 355 Mo. 805, 198 S.W.2d 342, 344, stated that the claimant of benefits could no longer satisfy the requirements by merely being passively available but had to be actively in search of work.

In Carlton v. Division of Employment Security, Mo.App., 246 S.W.2d 388, the court, in affirming an administrative finding adverse to claimant, stated on page 390, "Under respondent's evidence, the appeals referee could reasonably have found that respondent did not make a reasonable effort to secure suitable employment of a character which she was qualified to perform, hence was not actively in search of work. Said referee could also have reasonably found that respondent had unduly restricted her availability for employment in the area open to her. The finding of the appeals referee was, therefore, reasonable and not clearly contrary to the overwhelming weight of the evidence. * * *"

The Commission in the instant case sustained the finding of the Referee that claimants participation in the strike, to-wit, the part time picketing, was not of such a nature or extent of itself to render them unavailable for work, and that they met the statutory requirement so long as they were actively seeking work.

Respondent next cites Board of Review v. Mid-Continent Petroleum Corporation, 193 Okl. 36, 141 P.2d 69. We have thoroughly discussed this case in our opinion. Miller v. Unemployment Compensation Board of Review, 152 Pa.Super. 315, 31 A.2d 740 was decided under a statute entirely different from our own.

■ There is no dispute in the instant case that under the declaration of public policy in the Missouri Act, it was the intention of the legislature that benefits shall be paid only to persons "unemployed through no fault of their own". It is contended, however, that this general language as used in section 288.030, the declaration of public policy cannot prevail over the express provisions found in the Act, even if these may, to some extent, appear inconsistent. There would have been no need for the enactment of specific provisions relating to unemployment occasioned by labor disputes if it were intended that the act on public policy be all-inclusive. In fact, there would have been no need for the enactment of section 288.120, subd. 1 (1), the "voluntary leaving" provision.

In Re Steelman, 219 N.C. 306, 13 S.E.2d 544, 547, stated: "The appealing employee-claimants take the position that the interpretation of this section is perforce controlled by the declaration of policy contained in Sec. 2 of the Act, the general designation of "workers there selected for benefits being those who are 'unemployed through no fault of their own'. The Com-

mission and the court below thought otherwise. They followed the usual and accepted rule of construction that 'where a statute expresses first a general intent, and afterwards an inconsistent particular intent, the latter will be taken as an exception from the former and both will stand'. 1 Lewis' Sutherland on Stat.Constr., 2d Ed., § 268; Rodgers v. United States, 185 U.S. 83, 22 S.Ct. 582, 46 L.Ed. 816. * * *

"* * * It is a recognized principle of statutory construction, that when words of general import, the subject of a statute, are followed by words of particular or restricted import relating to the same subject matter, the latter will operate to limit or to restrict the former."

The statutes in the instant case clearly designated what the Commission must find in order to disqualify claimants for benefits where the unemployment was due to a stoppage of work because of a labor dispute at the plant. If this statute is inconsistent with the general policy as declared in the declaration of public policy, it limits and controls such general act. However, we believe that the two statutes are not inconsistent and by liberal interpretation can both stand. One is not at fault, who, because of a labor dispute leaves his active employment until such dispute is settled. That is his legal right. We are not here interested as to who was at fault in the labor dispute. The other authorities cited by respondent are decisions under statutes so unlike our own as to lend no weight to the solution of the issue herein involved, except the dissenting opinions in the Lawrence Baking Co. v. Michigan Unemployment Compensation Commission, supra, which follow the rule as declared in the Oklahoma case.

Under sub-section (b), point I, appellants contend that the "voluntary leaving" provision is inapplicable and, under sub-section (b) of respondent's brief, it is contended that the legislature indicated its intention to deny benefits to striking workers.

The provision is contained in section 288.120, subd. 1(1) RSMo 1949. The legislature provided that claimants would be denied benefits if the division finds "that he has left his work voluntarily without good cause attributable to his employment." It is admitted that there was a labor dispute; that claimants, together with all of the employees, went on strike and participated in the picketing at the employer's plant until the labor dispute was settled; that claimants were replaced by the employing of other labor. The Commission held that under these facts the relationship of employer-employee still existed; that the employment was terminated by the act of employer employing others and resuming production without the services of claimants; that this did not amount to leaving work voluntarily without good cause attributable to claimants' employment.

In Mark Hopkins, Inc., v. California Employment Commission, supra, the California Supreme Court, en banc, stated on page 239, of 151 P.2d:

"* * * The strike itself simply suspends the employer-employee relationship but does not terminate it. Iron Molders' Union [No. 125] v. Allis-Chalmers Co., 7 Cir., 166 F. 45, 52, 53, 91 C.C.A. 631, 20 L.R.A.,N.S., 315; Sandoval v. Industrial Commission, 110 Colo. 108, 130 P.2d 930, 934, 935;

"* * * The performance of picket duty gives rise to the inference that the employee has a continued interest in his employment at the struck establishment and has not relinquished his job there. * * *"
See also Burger v. Unemployment Compensation Board of Review, 168 Pa.Super. 89, 77 A.2d 737.

In Intertown Corporation v. Appeal Board of Michigan Unemployment Compensation Commission, 328 Mich. 363, 43 N.W.2d 888, 890, the Michigan Supreme Court, considering a contention identical with the one here involved, said:

"* * * The only question, therefore, is whether claimants left work voluntarily without good cause attributable to the employer. * * *

"In maintaining its neutral position in employer-employee relations, the State has

established statutory bases of disqualification for unemployment benefits. The disqualifications of subsection (a) are for the duration of unemployment, and this includes the voluntary leaving of work by the employee. The following subsection (b) disqualifies the employee for those weeks of his unemployment which are due to stoppage of work because of a labor dispute in which he is directly involved. This specific provision in regard to the labor dispute disqualification indicates that such should not be within the reach of the 'voluntary leaving' * * *.

"This Court need not characterize the 'fault' in the strike. Unemployment compensation does not depend upon the merits of a labor dispute. Lawrence Baking Co. v. Michigan Unemployment Compensation Commission, 308 Mich. 198, 13 N.W.2d 260, 154 A.L.R. 660. Claimants here did not quit their jobs; they went out on strike. Although on strike they were still employees. * * * They remained employees until discharged by the corporation during the second week of the strike."

Great Atlantic & Pacific Tea Co. v. New Jersey Department of Labor and Industry, 29 N.J.Super. 26, 101 A.2d 573; T. R. Miller Mill. Co. v. Johns, 261 Ala. 615, 75 So.2d 675, decided at the October Term of Court 1954 and 1955 held the same as the Commission found in the instant case.

Respondent cites Meyer v. Industrial Comm., 240 Mo.App. 1022, 223 S.W.2d 835, and the dissenting opinions in the Lawrence Baking Co. v. Michigan Unemployment Compensation Commission, supra. The Missouri case cited is where the employees refused to cross a picket line. They were not involved in a labor dispute and the case is no authority for respondents' contention. The dissenting opinions in the Michigan case follow the law as declared in the Oklahoma case and the minority rule in this country.

■ We find that the Commission was justified under the facts in the instant case in holding that claimants did not leave their work for causes attributable to their employment.

■ Under sub-section (c) of point I, appellants contend that the refusal work provision is inapplicable. It is contended under sub-section (c) of point I in respondent's brief that the legislature further indicated its intention to deny benefits to striking workmen by the wording of the refusal of work provision, citing section 288.-120, subd. 1(3) (b) RSMo 1949.

This provision reads: "Notwithstanding any other provisions of this law, no work shall be deemed suitable and benefits shall not be denied under this law to any otherwise eligible individual for refusing to accept new work under any of the following conditions".

The employer contends that the phrase "new work" conclusively shows that it was the intent of the legislature to deny unemployment benefits to strikers who refused to return to their old employment which was available to them. The employer argues, why otherwise was the word "new" included in the Act.

An examination of the Act shows that section 288.120, subd. 1(3) referred to as the "Refusal to work" section and the subdivisions thereof, set forth certain minimum standards for the determination of the suitability of work which is offered to, and refused by, benefit claimants. There is no showing here that claimants under said section fail without good cause either to apply for available suitable work when offered them either through the division or directly by the employer by whom they were formerly employed. The trial court did not pass upon this question, which was one of fact. The Referee resolved the issue in favor of claimants and we have held that there was substantial evidence to support his findings.

The authorities cited by appellants herein under this heading have all been discussed in our opinion heretofore. We agree with appellants that the refusal of work provision is inapplicable under the issues involved herein.

Under sub-section (d) of point I in appellants' brief, it is contended that the provisions of the statutes are not ambiguous. The trial court held that the sections were ambiguous. We have passed upon this contention in our rulings on other points.

Likewise, we have passed upon the contention raised under sub-section (d) in respondent's brief and hold that there is no merit to the contention.

Under point II of appellants' brief, it is contended that the evidence supports the findings of the Commission that claimants were available for work in the period subsequent to July 8th, 1950.

Section 288.110 RSMo 1949 provides unemployed worker eligible to receive benefits, when,

"(3) He is able to work, and is available for work; provided, however, that no person shall be deemed available for work unless he has been and is actively seeking work; * * *

"(6) He is not receiving nor has he received remuneration in the form of wages in lieu of notice or termination allowances."

The question involved here is whether the facts sustain the finding of the Commission that claimants were available for work and whether or not the $10 paid from the union funds to claimants, as striking employees, constitute wages. The Commission found that claimants were available for work. We stated in our opinion, heretofore, that the record supports the finding of the Commission. We, likewise, hold that the Commission's decision as to the $10 union fees paid to striking employees was a gratuity and not wages within the meaning of the statutes. We find there is no merit in the contentions in respondent's brief under points III, IV, and V.

The judgment of the trial court is reversed as to each of claimants in the cases appealed herein and the judgment of the Commission is ordered reinstated.

STONE and RUARK, JJ., concur.